**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD DENNIS, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| THE ANDERSONS, INC., | ) ) ) ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Richard Dennis ("Plaintiff") complains upon knowledge as to himself and his own acts and upon information and belief[1] as to all other matters against Defendant The Andersons, Inc., ("Defendant" or "The Andersons") as follows:

**NATURE OF THE ACTION**

1.      This action arises from The Andersons' manipulation of the prices of wheat futures and options contracts traded on the Chicago Board of Trade ("CBOT") from at least November 1, 2017 through December 31, 2017 (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), the Sherman Antitrust Act, 15 U.S.C. § 2, and common law.

2.      The Andersons is a diversified conglomerate that, among other things, trades futures and physical commodities, including wheat and other grains. In 2017, the Andersons Grain Group,

---

[1] Plaintiff's information includes counsel's investigation and publicly available data from the Chicago Board of Trade Notice of Disciplinary Action, CBOT 17-0851-BC-1 ("The Andersons, Inc. CME Notice" or "CME Notice"). Given the concealed and secretive nature of Defendant's manipulation, Plaintiff believes more evidence supporting the Complaint's factual allegations will be uncovered after a reasonable opportunity for discovery.

which trades wheat, generated $2.1 billion in revenue. The Andersons buys, sells, handles and stores physical wheat and transacts in wheat futures and options.

3.      During the Class Period, The Andersons specifically intended to and did cause artificial prices in CBOT wheat futures and options contracts by, among other things, registering 2,000 December 2017 soft red winter ("SRW") wheat shipping certificates in order to benefit its large CBOT wheat futures short position. This is a massive amount of wheat. Each shipping certificate represents 5,000 bushels of wheat, so 2,000 shipping certificates is 10 million bushels or 600 million pounds of wheat.

4.      A shipping certificate is an interest in physical wheat that can be registered on the CBOT and used to satisfy delivery obligations against CBOT wheat futures contracts. If someone registers a large number of shipping certificates, the market perceives a lack of demand for the wheat (because a large supply has been made available that could be delivered against the futures contract). That excess supply (and lack of demand) causes prices of wheat futures and options to decrease. The excess supply also causes the difference between near month futures prices and deferred months futures prices (spreads) to widen.

5.      On November 29, 2017, the day before the First Notice Day, which is the date the short position holder and long position holder receive notification that they have been matched, The Andersons held over 60% of the short open interest in the December 2017 SRW futures contract.

6.      In anticipation of the market impact of its registration, The Andersons placed bids in the front month spreads outside of previously existing trading ranges, including some at prices at which the spread had never previously traded. Further, in the month leading up to its registration of 10 million bushels of wheat, The Andersons sold wheat to mills in the Toledo, Ohio area in order to limit demand for SRW during the delivery period. This was all designed to benefit its futures market positions.

7.      The Andersons expected that the size and timing of the registration would cause the spread to widen.

8.      On November 29, 2017, The Andersons registered 2,000 shipping certificates.

9.      After prices dropped, The Andersons capitalized as the spread began to widen and its resting bids in wheat futures spreads began to fill at beneficial prices. The Andersons was also prepared to register even more SRW certificates in the event its resting bids were not filled.

10.     Between December 4 and December 22, 2017, the Andersons repurchased two-thirds (1,330 of the 2,000) of the shipping certificates it had registered days earlier through the delivery process and secondary market, all at prices lower than the original registration.

11.     On June 26, 2020, the CME Group Inc. ("CME") (which owns the CBOT) issued a Notice of Disciplinary Action  and levied a $2 million fine against The Andersons for its manipulation.

12.     Specifically, the CME concluded that The Andersons' violated a number of CBOT Rules, including Rule 432.B.2 ("to engage in conduct or proceedings inconsistent with just and equitable principles of trade"), 432.Q ("to commit an act which is detrimental to the interest or welfare of the Exchange or to engage in any conduct which tends to impair the dignity or good name of the Exchange"), and 432.T ("to engage in dishonorable or uncommercial conduct").

**JURISDICTION AND VENUE**

13.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, and Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

14.     Wheat is a "commodity" in interstate commerce and is the "commodity underlying" CBOT wheat futures and options contracts, as those terms are defined and used in Sections 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

15.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331 and 1337.

16.     Venue is proper in the Northern District of Illinois pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) through (d).

17.     In particular, the Northern District of Illinois is home to the CBOT and the CME, which host the CBOT SRW wheat futures and options trading at issue in this litigation. The CME, the exchange through which the alleged manipulation occurred, is in Chicago, Illinois, and the electronic trading system, through which the trades at issue were made, utilizes servers located in Chicago, Illinois.

18.     The CBOT is located in this District at 141 West Jackson Boulevard, Chicago, Illinois, 60604. The Andersons manipulated the prices of CBOT wheat futures and options, which are traded in this District on the CBOT. The CBOT became a wholly-owned subsidiary of the CME in or around July 2007. In June 2020, the CME issued a Notice of Disciplinary Action against The Andersons, fining it $2 million dollars for the manipulation of SRW wheat futures and options.

19.     Further, Plaintiff traded on the CBOT and thus sustained injury in this District, and other substantial events giving rise to the claims asserted herein occurred in this District.

20.     As such, a significant part of the events giving rise to the claims occurred in the Northern District of Illinois.

21.     The CBOT is designated by the CFTC as a board of trade. The CBOT applies to the CFTC for permission to trade each commodity in which the CBOT offers a contract. The CBOT must establish, among other things, that the proposed contract is not prone to price manipulation to win approval to trade such a contract. CBOT trading and clearing members must follow the rules of the CBOT and CME, including the rules prohibiting manipulation.

22.     Defendant, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

23.     Plaintiff Richard Dennis is a natural person who resides in Florida.  During the Class Period, Plaintiff Dennis traded hundreds of CBOT wheat futures and options contracts at artificial prices proximately caused by The Andersons' unlawful manipulation.  As a result, Plaintiff Dennis was deprived of transacting in a lawful, non-manipulated market in CBOT wheat futures and options contracts, and otherwise suffered damages as a direct and proximate result of The Andersons' manipulation.

24.     Defendant The Andersons is an Ohio corporation, with its principal place of business in Maumee, Ohio and offices and facilities all over the United States, that acts as a commodity merchandising firm, largely focused on buying, handling, storing, and selling physical grain, including wheat. During the Class Period, The Andersons actively traded CBOT wheat futures and options.

25.     Defendant is responsible for the trading and manipulation at issue, including by its agent(s) and/or persons acting on behalf of the Defendant.

## FACTUAL ALLEGATIONS

### I.     Industry Background

26.     **Commodity Futures Contract.** A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity, like wheat, at a specified time. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

27.     **"Long" and "Short" Futures.** CBOT wheat futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) delivery of wheat at a defined point in the future. Wheat futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract. But these deliveries do not often happen. To avoid delivery, the wheat futures contract can be offset or "rolled" forward before the contract goes into its delivery

cycle. These delivery cycles occur during five different contract months each calendar year: March, May, July, September, and December. For options on wheat futures, trading may be conducted in the nearby wheat futures options contract month and any succeeding months. The bilateral aspect of the futures contract is that there is a seller and a buyer—two sides, a long and a short. The "long" side is the buyer of the contract. In the rare event that the long does not offset or liquidate, the long is obligated to take delivery and pay for the commodity. The "short" side is the seller of the contract. In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates.

28.     **Offset by Trading.** Futures market participants almost always "offset" their futures contracts before the expiration month when deliveries occur. For example, a purchaser of one wheat futures contract may liquidate or cancel or offset a future obligation to take delivery of wheat by selling one wheat futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

29.     **Open Interest.** Open interest is the total number of futures contracts in a delivery month that have been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.

30.     **Volume.** Volume is the number of contracts traded during a specific period of time.

31.     Trading in Chicago SRW CBOT wheat futures and options is subject to the rules and regulations of the CBOT, including Chapter 14 (Wheat Futures) of the CBOT Rulebook.[2] Chapter 14 of the CBOT Rulebook sets forth the details for deliveries on CBOT wheat futures contracts, including, for example, wheat grade differentials, location differentials, and delivery points.

---

[2] *Available at* http://www.cmegroup.com/rulebook/CBOT/II/14/14.pdf.

32.     CBOT wheat futures and options are transacted electronically on the CME's Globex electronic trading platform and, in the case of options, also through "open outcry" on the trading floor of the CBOT. Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

33.     Prices of CBOT wheat futures contracts are quoted in cents per bushel. The contract size for a CBOT wheat futures contract is 5,000 bushels, or about 136 metric tons.

34.     CBOT wheat options contracts are the same size as one CBOT wheat futures contract.

35.     The "tick size" or minimum price fluctuation for trading wheat futures is ¼ cent per bushel, which is equivalent to $12.50 per futures contract, including spreads.

36.     CBOT wheat futures contracts are traded for delivery during five different contract months each calendar year: March (H), May (K), July (N), September (U), and December (Z). The last trade date for a particular CBOT wheat futures contract is the business day before the 15th calendar day of the contract month.

37.     CBOT wheat futures contracts are settled by physical delivery. The last delivery date is the second business day after the last trading day of the delivery month.

38.     Every aspect of a futures contract traded on the CBOT, like the grade and amount of wheat, is standardized—except the price and delivery month. This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central marketplace. Furthermore, the delivery date is standardized within a particular contract month. For example, all March wheat futures contracts require delivery at the beginning of April.

39.     **Spreads.** A spread refers to the price differential between any two items. For example, "spreads" often refer to price differences between futures contracts on the same commodity but with different expirations. For example, a spread could consist of the simultaneous purchase of a December wheat futures contract and the sale of a March wheat futures contract, in which the term "spread"

7

would describe the difference between the purchase price and the sale price of the two contract month components.

40.     Usually in a "spread position," the trader is long or short a futures contract for one delivery month and the opposite for another delivery month. For example, a person could be short the December 2017 wheat futures contract and long the March 2018 wheat futures contract. This is referred to as a "calendar spread" position.  The buying (or selling) of the near month contract expiring fastest, and the selling (or buying) of the next month after that is called a "front month spread." Buying the near month and selling the next month is called a "bull spread", while selling the near month and buying the next month after that is called a "bear spread." "Spreads" can also refer to the difference between the physical or "cash" commodity market price and the futures market price.

41.     **Shipping Certificate.** CBOT wheat futures contracts are physically delivered upon expiration. The delivery instrument on the wheat futures contract is a called a shipping certificate and only warehouses approved by the exchange can register and deliver these certificates. Registering a shipping certificate sends a signal to the market of a lack of immediate demand for wheat, as the wheat will sit in the warehouse instead of being used immediately. Therefore, by registering a shipping certificate, the price of cash and near-term futures prices will have the effect of depressing prices.

42.     The owner of a shipping certificate has several options: Shipping certificates can be bought and sold between traders or exchanged for futures positions, so the owner can transfer and sell the certificate to another market participant. The owner could also hold the certificate and pay storage fees. Or the owner could "cancel" the shipping certificate and order that the physical grain be "loaded-out" for transport. This is known as "canceling for load-out."

43.     "**First Position Day**." The first day in the delivery process. This is the day that the short position holder in the market indicates to CME Clearing that he intends to make delivery on his or her futures position and registers a shipping certificate in the CME Clearing delivery system. The

First Position Day is two business days prior to the first day of the delivery month. For example, in 2017, the First Position Day for the December Contract was Wednesday, November 29.

44.     "**First Notice Day**." This is the second day in the delivery process. On Notice Day, the short position holder and long position holder receive notification that they have been matched, and the long position holder receives an invoice from CME Clearing. First Notice Day is one business day prior to first delivery day of the current month contract. For example, in 2017, the First Position Day for the December Contract was Thursday, November 30.

45.     "**First Delivery Day.**" The first delivery date is the first business day of the calendar month of the delivery contract. On this day, the CME Clearing House simultaneously transfers the shipping certificates out of the short accounts and the monies out of the long accounts. Storage begins for the long the day following delivery. For example, in December, 2017, the first delivery day on that December contract was Friday, December 1.

46.     **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, wheat futures contracts).

47.     **Call Options.** Call options confer upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (person that is "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price of less than the underlying commodity is worth and make a profit. The seller (person that is "short") a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, the trader that is short a call option would prefer the value of the underlying commodity decrease. For contracts that are "out of the

money" the trader that is short a call option does not have to sell the underlying future commodity if the underlying price does not increase to the point that the value of the contract becomes worth exercising for the option holder.

48.     **Put Options.** Put options confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller (short) option trader wants the price of the underlying wheat futures commodity to stay above the strike price so that the seller of the option would not be forced to buy the underlying wheat futures at an above-market price.

**II.     Substantive Allegations**

49.     **The Andersons' Premeditated, Manipulative Scheme.** During the Class Period, The Andersons manipulated the prices of CBOT wheat futures and options contracts to cause artificial prices and artificial price trends in violation of the CEA.

50.     Defendant's unlawful conduct proximately caused injury and actual damages to Plaintiff and the Class.

51.     The Andersons' manipulation had several, interrelated steps:

(1)     **The Registration of Shipping Certificates (November 1-29, 2017).** During November 2017, when most market participants were liquidating their positions by entering into offsetting trades, Defendant maintained its large short position. At the same time, it was selling physical wheat in the cash market to Toledo area wheat buyers. It is generally uneconomical to take physical delivery against wheat shipping certificates registered at facilities outside of one's geographical region. Having satisfied their wheat demands,

those Toledo-area buyers offset their futures positions for the December contract. Despite selling the wheat its futures were meant to hedge, The Andersons still held more than 60% of the short open interest on the day immediately before the First Notice Day. On November 29, 2017, The Andersons registered 2,000 shipping certificates. According to the CBOT Business Conduct Committee, Defendant's market behavior indicated that Defendant "expected that the size and timing of the registration coupled with wheat economics could cause the spread to significantly widen."

(2) **Futures Spread Bidding.** Armed with advanced knowledge that it was going to register 2,000 shipping certificates and that nobody would need most of these certificates, Defendant entered into the bear spread position in wheat futures and options mentioned above. With its bear spread in place, Defendant set resting orders that would be triggered to liquidate its bear spread position at various prices. Indicative of both its true motive and its foreknowledge, Defendant set these resting orders not only wider than previously existing trading ranges, but wider than the spread had ever previously traded.

(3) **Repurchasing Shipping Certificates during the Delivery Period (December 1 – December 14, 2017).** The market learned that Defendant registered 2,000 shipping certificates and reacted as predicted. The prices of December 2017 wheat futures and options began to decline, and the December 2017-March 2018 wheat futures spread, among others, began to widen drastically. Because the demand in the Toledo area was largely satisfied in November, and no one outside of the Toledo area could economically take delivery of futures wheat from Maumee, Ohio, spreads continued to widen.

Defendant bought most of the registered certificates back from the participants who were matched to Defendant's certificates (and did not want to take possession of the physical wheat underlying those certificates). In fact, by December 22, 2017, Defendant repurchased 1,330 of the 2,000 certificates, and because Defendant manipulated the price lower, it was able to buy all of the certificates back at a lower price than when they were registered.

52. **Registering the Shipping Certificates was Uneconomical.** Defendant sold wheat in the cash market throughout November 2017.

53. It was only because of limited outstanding short-term demand in the Toledo region and the relatively large size of Defendant's position that its registration became economical. The CBOT Business Conduct Committee noted that Defendant's conduct "was only economical due to the large size and minimum load out cadence."[3] The large size ensured that a large percentage of the wheat would not be loaded out—if the wheat was loaded out for delivery, then the spread could have actually narrowed, and Defendant would have been forced to sell the wheat at the (uneconomical) futures market price. It was because of that large size and the minimum load outs that Defendant was able to manipulate the spread wider and reap the benefits outlined above—most notably, the profits earned from execution of its resting orders in the wheat futures and options markets.

54. Indeed, Defendant was prepared to register additional shipping certificates beyond the 2,000 that it registered on November 29 if futures prices did not artificially move in its desired direction. For example, the Business Conduct Committee found that "The Andersons were prepared to register even more [wheat] certificates in the event its resting bids were not filled."[4]

---

[3] *See* CME Notice.

[4] *See* CME Notice.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and as a representative of the following Class:

> All persons or entities (other than Defendant and any parent, subsidiary, affiliate, or agent of Defendant) that transacted in CBOT wheat futures or options contracts during the period of November 1, 2017 through December 31, 2017, inclusive (the "Class Period").[5]

56.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in CBOT wheat futures and options contracts during the Class Period.

57.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendant's common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendant's wrongful conduct in violation of the laws as alleged herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including commodity manipulation class action litigation.

59.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

(a)  Whether Defendant manipulated CBOT wheat futures and options contracts in violation of the CEA;

---

[5] Plaintiff has defined the Class based on currently available information and reserve the right to amend or expand the definition of the Class, including, without limitation, the Class Period and contracts at issue.

(b) Whether such manipulation by Defendant caused prices of CBOT wheat futures and options contracts to be artificial;

(c) Whether such manipulation by Defendant caused cognizable legal injury under the CEA;

(d) Whether Defendant's unlawful acts violate Section 2 of the Sherman Antitrust Act;

(e) The operative time period and extent of Defendant's foregoing violations;

(f) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

(g) The appropriate measure of damages suffered by the Class.

60.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a "large number" of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant.

61.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

62.     By its very nature, the unlawful activity alleged herein that Defendant engaged in was self-concealing.

14

63.     Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until it became public on June 26, 2020, after the entry of the CME Notice.

64.     Because Defendant employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the proposed Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on June 26, 2020. In fact, the whole point—for the manipulation to be effective—was that no one outside the Defendant would know Defendant's true plans.

65.     Due to Defendant's fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

### COUNT I
### (Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* and Regulation 180.2)

66.     Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

67.     Defendant, through its acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT #2 Soft Red Winter Wheat futures contracts and options in violation of the CEA, 7 U.S.C. §§1, *et seq.*, and Regulation 180.2, 17 C.F.R. §180.2.

68.     In all the circumstances previously alleged, Defendant had the ability to cause and did cause artificial prices.

69.     By the foregoing conduct, Defendant manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

70. Because the actions of Defendant's employees occurred within the scope of their employment, office, or agency with Defendant, Defendant is liable as a principal for their violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. §1.2 (2014).

71. Defendant's conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

72. Plaintiff and Class members are each entitled to damages for the violations alleged herein.

## COUNT II
### (Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* and Regulation 180.1(a))

73. Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

74. Defendant intended to affect or acted recklessly with regards to affecting the prices of SRW wheat futures contracts and engaged in overt acts in furtherance of its intent.

75. By the foregoing conduct, Defendant intentionally or recklessly used or employed a manipulative device, in violation of Section 6(c)(1) of the CEA, as amended, 7 U.S.C. §9, Section 22 of the CEA, as amended, 7 U.S.C. §25, and Regulation 180.1, 17 C.F.R. §180.1.

76. Because the actions of Defendant's employees occurred within the scope of their employment, office, or agency with Defendant, Defendant are liable as a principal for their violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. §1.2 (2014).

77. Defendant's conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the

16

Class Period.

78.     Plaintiff and Class members are each entitled to damages for the violations alleged herein.

## COUNT III
### (Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* and Regulation 1.2)

79.     Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

80.     Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of its agents, representatives, and/or other persons acting for it in the scope of their employment.

81.     Plaintiff and Class members are each entitled to damages for the violations alleged herein.

## COUNT IV
### (For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)

82.     Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

83.     Defendant ultimately registered 2,000 December 2017 wheat futures contracts on November 29, 2017, the First Position Day of that delivery period. On that same day, Defendant held over 60% of the short open interest in December 2017 CBOT wheat contracts, equivalent to 10 million bushels of wheat.

84.     The registration of 10 million bushels of wheat for delivery was uneconomical. Defendant had to register each of those 10 million bushels for delivery without a location differential, whereas that same wheat would yield a premium above par in the cash market. Defendant subsequently repurchased the majority of the wheat it registered, presumably to resell under more economic conditions.

85.     Defendant used its market power to lower December 2017 wheat futures prices and artificially widen the spread between the December 2017 and wheat futures contracts in deferred months.

86.     In violation of Section 2 of the Sherman Antitrust Act and Section 4 of the Clayton Act, Defendant monopolized and/or conspired to monopolize the market for SRW futures contracts from a time unknown to Plaintiff until at least December 22, 2017, or later.

87.     Defendant acquired short CBOT wheat futures contracts as part of a plan to acquire monopoly power in the wheat market for its own financial benefit.

88.     Defendant registered a commercially unreasonable number of shipping certificates during the December 2017 wheat futures delivery period that constituted a dominant position. This gave Defendant great influence or control over the prices of CBOT wheat futures and options contracts.

89.     Defendant, in fact, had caused prices to become artificial during November-December 2017.

90.     Defendant's unlawful price control affected CBOT SRW futures and options contract prices during November-December 2017. For example, Defendant used its position of control to force the spread between the December 2017 and March 2018 CBOT wheat futures contracts to widen by artificially decreasing the prices of December 2017 CBOT wheat futures contracts relative to the March contract. This caused the spread to widen beyond where it had traded before.

91.     The anticompetitive effects of Defendant's conduct far outweigh any ostensible competitive benefits or justifications.

92.     Defendant's anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiff and other members of the Class that traded CBOT wheat futures contracts were deprived of normal, competitive trading patterns and, instead, were subjected

to artificially determined prices as a result of Defendant's unlawful and manipulative conduct. As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

93.     Plaintiff and members of the Class have been injured in their business or property by Defendant's attempted monopolization and monopolization of the CBOT wheat market. Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Antitrust Act alleged herein.

## COUNT V
### (Unjust Enrichment and Restitution/Disgorgement)

94.     Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

95.     Defendant financially benefited from its acts. In addition to being unlawful, Defendant's acts are also unfair and inequitable. For any of these reasons, it is unjust and inequitable for Defendant to have unjustly enriched itself and now retains the benefits from acting in this manner.

96.     These inequitable acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact wheat contracts at artificial prices.

97.     Defendant should pay its unjust enrichment to Plaintiff and members of the Class.

98.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendant from its unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and his counsel as Class counsel;

(B)     For a judgment awarding Plaintiff and the Class damages against Defendant for its violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)     For a judgment awarding Plaintiff and the Class damages against Defendant for its violations of the Sherman Act, including treble damages, with prejudgment interest at the maximum rate allowable by law:

(D)     For a judgment awarding Plaintiff and the Class any and all sums of Defendant's unjust enrichment;

(E)     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendant's unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(F)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' fees and expenses; and

(G)     For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury.

Dated: July 10, 2020                                        Respectfully submitted,

*s/          Anthony F. Fata*
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
Anthony F. Fata
Jennifer W. Sprengel
Brian P. O'Connell
Kaitlin Naughton
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.: 312-782-4880

**LOWEY DANNENBERG, P.C.**
Vincent Briganti (*pro hac vice* forthcoming)
Raymond Girnys (*pro hac vice* forthcoming)

Craig Maider (*pro hac vice* forthcoming)
44 South Broadway
White Plains, New York 10601
Tel.: 914-997-0500

*Counsel for Plaintiff and the Proposed Class*