IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICHARD DENNIS, PORT 22, LLC, and    )
MICHAEL GLASS,    )
    )
    Plaintiffs,    )    No. 20 C 4090
    )
    v.    )    Judge Robert W. Gettleman
    )
THE ANDERSONS, INC., and    )
CARGILL, INC.,    )
    )
    Defendants.    )

**MEMORANDUM OPINION & ORDER**

Richard Dennis, Port 22, LLC, and Michael Glass (collectively "plaintiffs") seek to proceed on behalf of a class of similarly situated wheat futures market participants on claims of market manipulation under the Commodity Exchange Act, violations of the Sherman Antitrust Act, and unjust enrichment and restitution/disgorgement under Illinois law, against The Andersons, Inc. and Cargill, Inc. (collectively "defendants"). For the reasons below, the court grants the motion for class certification in part. (Doc.147).

**BACKGROUND**

Plaintiffs assert Commodity Exchange Act ("CEA"), 7 U.S.C. §§1, et seq., and Sherman Antitrust Act ("Sherman Act"), 15 U.S.C §§1-2, claims, alleging that defendants, who were supposed competitors, operated multiple grain storage warehouses in Ohio and collaborated to manipulate prices of soft red winter wheat ("SRW wheat") futures and options contracts on the Chicago Board of Trade ("CBOT").

1

Plaintiffs allege that defendants' scheme began with the sale of large quantities of SRW wheat to major purchasers in October and November 2017 to suppress demand for physical SRW wheat. Then, on November 29, 2017, The Andersons, Inc. registered for delivery two thousand certificates of CBOT December 2017 SRW wheat. This registration (falsely and intentionally, plaintiffs allege) signaled that The Andersons, Inc. would sell ten million bushels of physical SRW wheat to parties holding long positions in December 2017 SRW wheat futures. Consequently, December 2017 SRW wheat futures prices decreased and the spread between the December 2017 and March 2018 SRW wheat futures contracts widened. By virtue of the positions held by defendants, they profited off of the widening of the spread. Defendants later collectively repurchased some of those earlier registered shipping certificates at decreased prices. Plaintiffs allegedly transacted in December 2017 and March 2018 SRW wheat futures and lost money because of the decreased prices and widened spread caused by the scheme.

Plaintiffs seek to certify the following class:

All persons or entities who purchased—(a) a long position in Chicago Board of Trade ("CBOT") soft red winter ("SRW") wheat December 2017 or March 2018 futures contracts; (b) a long position in CBOT call options on CBOT soft red winter wheat March 2018 futures contracts; or (c) a short position in CBOT put options on CBOT soft red winter wheat March 2018 futures contracts—and subsequently liquidated the position through an offsetting market transaction at any point during the period of November 30 through December 14, 2017, inclusive (the "Class Period"), except that sales of CBOT March 2018 futures contracts made after December 14, 2017 qualify for inclusion in the Class only to the extent they were made in liquidation of a long position in the CBOT March 2018 contract which was initiated prior to December 14, 2017. Excluded from the Class are Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

In their class certification filings, plaintiffs rely upon the initial and rebuttal reports of

2

their expert, Dr. Craig Pirrong ("Pirrong"), to establish requirements for class certification, including typicality and predominance of common issues over individual issues. Pirrong opines that defendants' manipulation of December 2017 and March 2018 SRW wheat futures injured plaintiffs on a class-wide basis. Pirrong estimates class-wide damages and proposes a methodology for determining individual damages. Defendants challenged the reliability of Pirrong's study through the report of their expert, Professor Justin McCrary.

## LEGAL STANDARD

A court will certify a class if plaintiffs satisfy the four requirements of Rule 23(a)—numerosity, commonality, typicality and adequacy of representation—and, in addition, the requirements of one of the Rule 23(b) subsections. Fed. R. Civ. P 23(a) and (b). See Kleen Products LLC v. International Paper Co., 831 F. 3d 919, 923 (7th Cir. 2016). Plaintiffs here seek to certify this class under Rule 23(b)(3), which allows the court to certify a class action if Rule 23(a) is satisfied and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 "does not set forth a mere pleading standard;" rather, plaintiffs bear the burden to "affirmatively demonstrate [their] compliance with the Rule" by a preponderance of the evidence. Wal-Mart Stores Inc. v. Dukes, 564 U.S. 338, 350 (2011); see also Mesner v. Northshore University Health System, 669 F.3d 802, 811 (7th Cir. 2012) (holding that "[i]t is sufficient if each disputed requirement has been proven by a preponderance of evidence"). Certification of a class is proper only if "the trial court is satisfied, after a rigorous analysis," that

the requirements of Rule 23 are satisfied.  General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).  The rigorous analysis required by Rule 23 may "have some overlap with the merits of the plaintiff's underlying claim," Dancel v. Groupon Inc., 949 F.3d 999, 1005 (7th Cir. 2019), but the "court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."  Messner, 669 F. 3d at 811.

## **DISCUSSION**

### A.  **Numerosity**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P 23(a)(1).  Plaintiffs argue that the relevant CME large trader report "shows that there are at least 1,387 geographically dispersed class members."  Plaintiffs cite authority holding that classes consisting of forty or more members generally satisfy the numerosity requirement. See Mulvania v. Sheriff of Rock Island County, 850 F.3d 849, 859-60 (7th Cir. 2017); Schmidt v. Smith & Wollensky, LLC, 268 F.R.D. 323, 326 (N.D. Ill. 2010).  In addition, plaintiffs argue that courts can "make evidence-based 'common sense assumptions' in assessing numerosity."  Moehrl v. National Ass'n of Realtors, No. 19-cv-01610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023).

Defendants respond by questioning whether the CME Large Trader Report is admissible and arguing that some of the entries in the report are duplicative.  Additionally, defendants argue that plaintiffs fail to provide evidence that joinder is impracticable.  Defendants argue that the class is likely filled with sophisticated traders who are well-resourced and capable of participating in a joinder action.

4

The court finds that plaintiffs have satisfied the Rule 23(a)(1) numerosity requirement by a preponderance of the evidence. The evidence supporting this finding is obvious; for example, the SRW wheat futures market has an average daily trading volume of 134,000 contracts. Defendants primarily stake their argument on the legal standard, arguing that "mere allegations" are not enough. Even if one were to concede that the claims of defendants underlying conduct are "mere allegations," which of course plaintiffs do not, the focus here is not proof of the conduct but proof of the number of parties that the alleged conduct affected if it occurred. Defendants cannot seriously maintain that the size and scope of the market they are alleged to have manipulated is a "mere allegation." It is not surprising that courts routinely find numerosity in commodity manipulation cases, because they impact an entire marketplace. See, e.g., Kohen v. Pac. Inv. Mgmt. Co. LLC, 244 F.R.D. 469, 476 (N.D. Ill. 2007) ("Kohen I"), aff'd, 571 F.3d 672 (7th Cir. 2009) ("Kohen II"); In re Amaranth Nat. Gas Commodities Litig., 269 F.R.D. 366, 379 (S.D.N.Y. 2010). A common sense reading of the evidence indicates that the putative class contains at least hundreds of members that are likely dispersed throughout the country. Regardless of the sophistication of the parties, that volume alone makes joinder impracticable.

## B. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs argue that there are overarching questions in this case, such as whether defendants engaged in the alleged manipulation and whether that manipulation caused artificial prices, that are central to the validity of each class member's claim. Plaintiffs stress that commonality is a "low hurdle," Kohen I, 244 F.R.D. at 476, and that "even a single common question will do" to satisfy the commonality requirement. Dukes, 564 U.S. at 359 (internal quotations omitted). Defendants do not contest commonality.

5

The court is satisfied that plaintiffs have satisfied Rule 23(a)(2) by a preponderance of the evidence. The existence and impact of the alleged manipulative scheme is central to every class member's claims under the CEA and Sherman Act.

## C. Typicality and Adequacy

Because the arguments on adequacy and typicality are intertwined, the court will address the issues together. Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Here, there are three proposed class representatives: Port 22, Michael Glass, and Richard Dennis. Defendants contest the typicality and adequacy of each class representative. The court will analyze each in turn.

### 1. Port 22

Plaintiffs argue that the claims of Port 22 are typical because they arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and its claims are based on the same legal theory. Plaintiffs argue that Port 22 will adequately represent the class because it asserts the same claims against defendants under the same statutes and common law as the class members. Because Port 22 transacted in the same allegedly manipulated market as other class members, plaintiffs contend that it has the same interest to establish that defendants' conduct caused artificial prices.

Defendants argue that Port 22 is atypical for three reasons. First, Port 22 transacted only in March 2018 contracts but did not transact in any December 2017 contracts. Second,

6

defendants argue that because Port 22 was a net-gainer from the alleged manipulation and subsequent price artificiality, it lacks standing to bring its CEA claims. Third, defendants argue that because Port 22 was a net-gainer, it lacks any clear interest in representing class members who were left worse-off by the alleged manipulation and subsequent price artificiality.

The court disagrees with defendants. The class is defined to include traders who made at least one of three categories of transactions (long December 2017 or March 2018, long call March 2018, or short put March 2018) between period of November 30 through December 14, 2017, or the "class period." The court does not follow defendants' contention that Port 22's lack of transactions in December 2017 SRW futures during the class period renders its position atypical. Transacting in December 2017 SRW futures during the class period is a sufficient, but not necessary, condition to qualifying for the class as it is defined. It is likely that other putative class members qualify due to their transactions in March 2018 SRW futures during the class period, just like Port 22. As discussed above, the claims of class members who transacted in either or both December 2017 and March 2018 SRW futures center on the same alleged manipulative conduct. Defendants do not explain why the claims of a class member who transacted only in March 2018 SRW futures would diverge from those of a class member who transacted in only December 2017 SRW futures (or both categories) in any meaningful sense other than at the calculation of damages. Thus, the claims of Port 22 are typical of the class even though it transacted only in March 2018 SRW contracts.

The court also disagrees with defendants' argument that proof of net damages is a required element of a CEA claim. Defendants rely on Braman v. The CME Group, Inc., 149 F. Supp. 3d 874, 892 (N.D. Ill. 2015), which cites In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 714 (S.D.N.Y. 2013), for the proposition that the CEA claims

7

require a showing of "net loss." But the court declines to follow this proposition for three reasons.

First, In re LIBOR-Based Fin. Instruments Antitrust Litig. was later vacated and remanded by the Second Circuit in Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016). In defense of the Braman court, In re LIBOR-Based Fin. Instruments Antitrust Litig. was overturned after the Braman court issued its decision. The Second Circuit's reversal was based on the district court's analysis of the Sherman Act claims, not the CEA claims. Nevertheless, the court is not inclined to be moved by the persuasive force of an overturned, out-of-circuit district court decision.

Second, chasing down the line of precedent further, In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d at 714, cites In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 379 (S.D.N.Y. 2010), for the "net loss" proposition that eventually ended up in Braman. But the In re Amaranth court disavowed the position that plaintiffs must show a net loss at the class certification stage. Instead, the In re Amaranth court held that "case law suggests that because plaintiffs transacted at artificial prices, injury [under the CEA] may be presumed." 269 F.R.D. at 379-80. In addition, the same court held that "the Second Circuit does 'not require that each member of a class submit evidence of personal standing.'" 269 F.R.D. at 380 (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d. Cir. 2006)).

Third, and most importantly, Seventh Circuit precedent does not require net loss as an element of a CEA claim.[1] In the Seventh Circuit, the elements of a CEA manipulation claim are

---

[1] The court does not mean to suggest that there is a circuit split between the Second and Seventh Circuits on whether net loss is a required an element of a CEA claim. Answering that question would require a deeper investigation of Second Circuit precedent that the court need not undertake here.

the following: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." Kohen I, 244 F.R.D. at 475 (aff'd Kohen II, 571 F.3d 672 (7th Cir. 2009)); see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig., 801 F.3d 758, 764–65 (7th Cir.2015) (listing the same elements). In summary, the court finds that a showing of net loss is not an element of a CEA claim, and Port 22 is not required to make such a showing for its claims to be typical of the proposed class.

The adequacy of representation issue presents a close question. As discussed above, plaintiffs offer substantive responses to defendants' arguments on Port 22's typicality and lack of standing. In contrast, plaintiffs' only response to defendants' argument that it lacks interest in representing class members is the assertion that "Port 22 is fully motivated to litigate and prove the precise facts underlying the claims of all Class members."

The question is whether Port 22, as a net-gainer, lacks a clear interest in adequately representing class members who were left net worse off by defendants' conduct. Plaintiff is correct that a court need not net a class members' transactions at this stage. See Kohen II, 571 F.3d at 676 (explaining that determining which parties suffered net damages before class certification would be "putting the cart before the horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification"). But the court does not consider netting here for the purpose of determining predominance. Instead, the court must consider netting here specifically to determine if Port 22, a proposed class representative, can adequately represent the class.

While recognizing it is a close question, the court finds that Port 22 is an adequate class

9

representative. The Seventh Circuit has held that "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims." Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992). The Supreme Court has explained that the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). Defendants have not argued, nor does the court perceive, that there exists some sort of conflict of interest between Port 22 and proposed class members because of the net damages issue. In Spano v. the Boeing Co., 633 F.3d 574, 587 (7th Cir. 2011), where the Seventh Circuit reversed a class certification partially based on the inadequacy of the class representative, it explained that "the class is defined so broadly that some members will actually be harmed by that relief." Here, although Port 22 may be a net-gainer, there is no such threat that class members will be harmed by any obtainable relief secured by Port 22, or vice versa. The Seventh Circuit later clarified that it "has never held, and Spano did not imply, that the mere possibility that a trivial level of intra-class conflict may materialize as the litigation progresses forecloses class certification entirely." Abbott v. Lockheed Martin Corp., 725 F.3d 803, 813 (7th Cir. 2013). Here, defendants do not point to anything more than the abstract supposition that there may be conflict between Port 22 and class members. Defendants have not explained why even a trivial level of conflict between Port 22 and proposed class members would arise here.

Thus, the court is convinced that Port 22 has shown by a preponderance of the evidence—based on the competency of its prosecution of the suit thus far, the quality of its counsel, and its assurance that it intends to fully litigate the claims of the class—that it will adequately represent the class. See generally Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993) (explaining that "adequacy of representation is composed of two

10

parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members") (internal quotation omitted). Defendants' invocation of a vague possibility of intra-class conflict for unarticulated reasons is not enough to upset this finding.

### 2. Michael Glass

Defendants argue that Glass cannot serve as a class representative for two reasons. First, according to defendants, Glass was a net-gainer. As the court explained above, in the factual context of this litigation, that is not enough to render Glass an inadequate class representative. Second, defendants argue that Glass presents serious credibility problems because CME fined him for spoof trading the March 2018 SRW contract.

Plaintiffs respond that although Glass reached a settlement with CME in 2019 regarding spoof trading allegations, he denies them. Plaintiffs' primary argument is that credibility issues do not bear on a named representative's ability to represent the class absent some indication that the named representative has an antagonistic interest to the class or does not have sufficient interest in the outcome of the case.

The court agrees with defendants. While Glass entered the settlement "without admitting or denying" any rule violations, he agreed to a statement that the Chicago Board of Trade Business Conduct Panel ("CBOT Panel") found that Glass violated CME rules. According to the CME market regulator's memorandum in support of the offer of settlement, Glass violated CME rules in two specific instances. One of these two instances concerned trades of March 2018 SRW futures, one of the contracts that are the subject of this suit. Plaintiffs argue that "credibility" concerns will not defeat a named plaintiff's adequacy under Rule 23(a)(4) unless

11

"the evidence is so severely undermining of his credibility that a fact finder might reasonably focus on his credibility, to the detriment of the absent class members' claims." Lacy v. Cook County, 897 F.3d 847, 866 (7th Cir. 2018) (internal quotation omitted). The court finds that the evidence here is indeed so severely undermining of Glass's credibility that a fact finder might reasonably focus on the spoof-trading allegations to the detriment of absent class members' claims. It is especially concerning that Glass's credibility is questionable "on an issue that relates directly to a central part of the litigation." Lacy v. Dart, No. 14-cv-6259, 2015 WL 1995576, at *5 (N.D. Ill. Apr. 30, 2015).

In addition, it is quite likely that Glass's conduct injured some class members, especially those who traded in March 2018 SRW contracts. While that injury is, strictly speaking, a separate issue from the injury at issue in this case, the court finds that Glass's conduct would create an antagonistic relationship between him and unnamed class members. See Rosario, 963 F.2d at 1018 (explaining that "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims"). Consequently, the court denies plaintiffs' motion to appoint Michael Glass as a class representative.

### 3. Richard Dennis

Defendants argue that Dennis cannot serve as a class representative because his claims are not typical of the class. According to defendants, Dennis's claims are atypical of the class because his CEA claims stem from trades made in a trading account jointly owned with his brother, Thomas Dennis. Defendants argue that this co-ownership issue will create difficulty in ascertaining an actual damages figure, which distinguishes his claims from his fellow class members.

12

Plaintiffs reply that the joint ownership structure of the Richard Dennis's account is irrelevant. Plaintiffs argue that defendants' position is clearly contradicted by precedent holding that joint ownership of relevant assets in a class action case will not destroy the typicality of a named representative's claims. Additionally, plaintiffs highlight defendants' concession that Richard Dennis held some degree of ownership in the account for the entire class period.

The court agrees with plaintiffs. The co-ownership structure of Dennis's account is irrelevant to his underlying claims, which are typical of the class. In Kohen I, the court rejected a similar argument, holding that "decision to purchase as a co-owner of a joint account should not affect his ability to seek remedies under the CEA because [plaintiff] has alleged that he suffered actual damages from purchasing the…Contract at a manipulated price." 244 F.R.D. at 474; see also Hochschuler v. G. D. Searle & Co., 82 F.R.D. 339, 346 (N.D. Ill. 1978) (rejecting the argument that "[plaintiff's] claim is atypical because he purchased the stock jointly with his wife" and holding that "[t]he fact that [plaintiff] chose to purchase as a co-owner with his wife in no way suggests that his investment decision is any different than that of a person who purchases alone"). Consequently, the court finds that Dennis is an adequate class representative.

## D. Predominance

Plaintiffs seek to certify this class under Fed R. Civ. P. 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Plaintiffs argue that the common questions of law or fact here are defendants' alleged manipulation and the impact of that alleged manipulation on prices. According to plaintiffs, their CEA claims, Sherman Act claims, and the unjust

13

enrichment claim all center around two common questions that predominate over individual questions: whether there was a scheme and whether the scheme impacted prices. Plaintiffs argue that these two central questions, which are common to all class members' claims, will be proved by common factual and economic evidence.

Defendants stake most of their case against class certification on plaintiffs' failure to satisfy the predominance requirement. Because defendants' arguments are extensive and the court is required to conduct a "rigorous analysis," the court will provide a detailed summary of defendants' arguments and plaintiffs' responses. See Falcon, 457 U.S. at 161.

## 1. Summary of arguments

Defendants' first set of arguments concern "net-gainers." A net-gainer is someone who, due to executing transactions on both sides of the market (e.g. both buying and selling March 2018 SRW futures), benefited more from price artificiality than they were harmed by it. Defendants make multiple arguments related to the net-gainer issue. First, defendants argue that the proposed class is overbroad because it includes "net-gainers" and intraday traders who could not have been harmed.[2] Second, defendants argue that because the class includes net-gainers, and defendants have failed to present a workable methodology to separate unharmed class members from those who were harmed, determining actual damages will requires a series of mini trials. According to defendants, this series of mini trials will predominate over the common questions, not the other way around. Third, defendants argue that net-gainers lack an essential element for a CEA claim, which defendants argue requires showing a net loss.

---

[2] While this overbreadth argument is not strictly about predominance, the court will analyze it in this section of its analysis because it is closely related to the argument about whether the need for individualized damages determinations among class members will defeat predominance.

Defendants' second set of arguments concern the deficiency in the class expert, Dr. Craig Pirrong's, methodology proving price artificiality and harm. Defendants argue that Pirrong's models are the only proffered class-wide proof of the existence of price artificiality, and proof of price artificiality is a required element of plaintiffs' CEA and antitrust claims. For reasons largely the same as in a previous Daubert motion, see Dennis v Andersons, Inc., No 20-cv-4090, 2024 WL 5127313 (N.D. Ill. Dec. 17, 2024), defendants argue that Pirrong's model should be given no weight because it employs unreliable statistical models. Defendants argue that the court is required to analyze not only the admissibility of Pirrong's model, but also its "correctness." The bottom line, according to defendants, is that plaintiffs "do not meet their burden to show that they have a method of proving artificiality and damages."

Defendants' third set of arguments concern their statute of limitations defense to plaintiffs' CEA claims. Defendants argue that there is evidence that some members of the proposed class discovered their injury more than two years before the lawsuit was filed, hence time-barring their CEA claims. Defendants point to internal communications from "CIGUS," a global commodity buyer, seller, distributor, and absent class member, that defendants argue shows that CIGUS had actual notice of their CEA claim since 2017, more than two years before the complaint was filed in July 2020. Defendants also point to a subscription newsletter and post on Twitter about The Anderson's use of a manipulative device in the market.

Defendants argue that in these circumstances, the record must reveal that resolution of the statute of limitations defense on the merits may be accomplished on a class-wide basis before a court can certify a class, and plaintiffs have failed to carry their burden to show how such a resolution may be accomplished. Defendants stress that the limitations period begins to accrue once an individual plaintiff has actual notice of their CEA claim.

Plaintiffs argue that the proposed class is not overbroad. According to plaintiffs, defendants' argument fails to make the key distinction between class members who <u>could not be</u> harmed and class members who <u>were not</u> harmed. Plaintiffs argue that while courts deny certification to putative classes containing members who could not be harmed by the conduct at issue, the same is not true of putative classes containing members who could be harmed but ultimately were not. Specifically, plaintiffs direct the court's attention to Judge Chang's opinion in <u>Ploss v. Kraft Foods Group Inc.</u>, 431 F. Supp. 1003 (N.D. Ill. 2020). According to plaintiffs, the fact that net-gainers and intraday traders were ultimately not harmed is a damages issue and is generally irrelevant at the class certification stage.

Plaintiffs argue that they have provided a workable methodology to separate net-gainers and intraday traders from class members that were harmed which will not require a series of mini trials. Plaintiffs' proposal is the following: "individual Class members' transactions will be provided by the Class members at the appropriate stage of the litigation, and the Claims Administrator can use these records to calculate each Class member's damages based on the common information and Dr. Pirrong's methodology." Plaintiffs argue that they have met their burden to show that proof of damages caused by the scheme will either fail or succeed on a class-wide basis.

Plaintiffs' response to defendants' argument that net-gainers do not have standing to bring CEA claims largely mirrors their response to the argument that Port 22, as a net-gainer, lacks standing to bring its CEA claim. Plaintiffs reiterate that proof of net damages is not a required element of a CEA claim. According to plaintiffs, they need not prove actual damages at the class certification stage. Instead, their burden is to prove that actual damages, like all the other elements of plaintiffs' claims, are capable of proof at trial through common evidence.

16

Plaintiffs argue that Pirrong's testimony meets this burden. Plaintiffs also note that defendants did not address their two Sherman Act claims.

As they did in response to the Daubert motion, see 2024 WL 5127313, plaintiffs defend the validity of Pirrong's report. Beyond defending the statistical methods employed by Pirrong, plaintiffs stress that it is not the court's role to substitute its own finding of fact for that of the jury. Rather, plaintiffs' burden is to show that the class's claim will rely upon common evidence. Plaintiffs argue that, with Pirrong's study, they have shown just that.

Finally, plaintiffs argue that the CEA statute of limitations does not defeat the predominance of common questions over individual questions. Plaintiffs point out that defendants, after extensive discovery, provide a single example of a class member that they contend had notice of misconduct. Plaintiffs also point out that defendants' theory of actual notice to a broader swath of class members hinges upon two relatively weak pieces of evidence: (1) an industry newsletter that includes defendants' own affirmative justification of its conduct; and (2) a Tweet that has garnered a total of three likes and zero reposts since it was posted in 2017 and notes that its source of information "doesn't have many followers." Beyond the paucity of the evidence, plaintiffs' overarching argument is that the court must determine under Fed. R. Civ. P. 23(b)(3) whether common issues predominate in the case as a whole, even if there are some important matters that will have to be tried separately.

## 2. Discussion

### a. Overbreadth

The court finds that the proposed class is not overbroad. At root, the court agrees with plaintiffs that defendants fail to apprehend the distinction between class members not harmed

and class members who could not have been harmed. In <u>Messner</u>, 669 F.3d at 824, the Seventh Circuit contrasted "a class [] defined so broadly as to include a great number of members who for some reason <u>could not have been harmed</u> by the defendant's allegedly unlawful conduct" with "a proposed class [that] consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm." (Emphasis added). While the in the former situation the class "is defined too broadly to permit certification," the latter situation "may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits." <u>Id.</u> The Seventh Circuit provided an example of an overbroad class in <u>Messner</u>, 669 F.3d at 824-25, "a class shown to include…a vast number of people who could not have been harmed by the merger because they purchased medical services in the absence of the market power allegedly created by that merger."

Here, defendants argue that 34% of the members of the proposed class were ultimately net-gainers, meaning that the benefit they reaped from defendants' alleged manipulation was greater than the harm they suffered. If defendants are correct, these net-gainers ultimately suffered no net harm. But the reason that the net-gainers suffered no <u>net</u> harm is not because they were not harmed at all, but rather because also they received a windfall. Unlike the example described in <u>Messner</u> of purchasers who entered contracts before the alleged market power arose, the net-gainers here transacted after the alleged price artificiality arose. Thus, these class members could have been harmed by defendants' alleged conduct.

Beyond its alleged inclusion of class members who could not have been harmed by defendants' conduct, there is a second reason that the class here could be overbroad: a class "should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." <u>Kohen II</u>, 571 F.3d at 677. The Seventh Circuit

18

explained that this is due to the "in terrorem character of a class action," which will put the defendant "under pressure to settle rather than to bet the company" even if "the probability that the plaintiff will succeed in establishing liability is slight." Id. at 678. In Messner, 669 F.3d at 825, the Seventh Circuit explained that "[w]hile that prospect is often feared with large classes, the effect can be magnified unfairly if it results from a class defined so broadly as to include many members who could not bring a valid claim even under the best of circumstances."

For two reasons, the court rejects the argument that the proposed class is overbroad due to its inclusion of many class members who suffered no injury at the hands of the defendants. First, there is a distinction between "injury" and "harm." While evaluating harm may require some concept of netting, an "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015). Thus, the presence of net-gainers in the class does not make "apparent that it contains a great many persons who have suffered no injury at the hands of the defendant," because net-gainers are alleged to have suffered an antitrust injury. Messner, 669 F.3d at 825 (quoting Kohen II, 571 F.3d at 677).

Second, the inclusion of the net-gainers in this case does not magnify unfairly the in terrorem character of a class action. See generally Messner, 669 F.3d at 825. Defendants contend that net-gainers comprise 34% of the class. If defendants are correct, then defendants face no additional pressure to settle on account of the net-gainers, because defendants need not fear the prospect of net-gainers ultimately recovering. This is unlike the case described in Kohen II, 571 F.3d at 678, where a defendant may be forced into settlement due to the combination of a

very large class with a small chance of an unfavorable (to defendants) ruling on liability.[3] Whereas an ultimate finding on liability can present defendants with a black box—even when armed with what seems to be an ironclad case on liability, defendants cannot rule out the possibility of a factfinder seeing it differently—here, regarding a damages determination, defendants face no such uncertainty. If defendants are right that this portion of the class were net-gainers, then there is zero prospect that they will recover from defendants, because these defendants will have no compensable damages.

The cases that the Kohen II court identified as examples of an unfairly magnified in terrorem effect are, compared to the facts here, much more dramatic in scale and ultimately threatened the possibility of massive liability for defendants. See e.g., In re Bridgestone, Firestone, Inc., 288 F.3d 1012, 1015-16 (1st Cir. 2009) (finding that a class comprising "[m]ore than 60 million tires and 3 million vehicles….manufactured and sold across ten years makes the case so unwieldy, and the stakes so large, that settlement becomes almost inevitable"); Parker v. Time Warner Entertainment Co., 331 F.3d 13, 22 (2d Cir. 2009) (contemplating the "in terrorem effect on defendants, which may induce unfair settlements" that could stem from aggregation of statutory damages claims "so far beyond the actual damages suffered that the statutory damages come to resemble punitive damages"). Based on the facts of this case, the court does not fear that the inclusion of the net-gainers, whom defendants were able to easily identify, risks forcing defendants into an unfair settlement. See Messner 669 F.3d at 825 (holding that "[s]uch determinations are a matter of degree, and will turn on the facts as they

---

[3] In this type of situation, despite the small chance of liability, defendants nevertheless face a claim with a large expected value and are thus motivated to settle it. In contrast, when the probability of recovery is zero—which is true of the claims of net-gainers without compensable damages—the expected value of their claims is zero. Defendants should not be similarly motivated to settle such zero-expected-value claims.

appear from case to case").

    b.   Common questions and individualized damages determinations

The court finds that individualized damages determinations will not predominate over common questions. To conduct this analysis, the court must break down the claims into their constituent elements and then determine which issues are common, individual, and predominant. See Simpson v. Dart, 23 F.4th 706, 713 (7th Cir. 2022) (holding that "a district court should begin [certification analysis] by identifying the elements of the plaintiff's various claims"); see also Messner, 669 F.3d at 815 (explaining that "[a]nalysis of predominance under Rule 23(b)(3) begins, of course, with the elements of the underlying cause of action") (internal quotations omitted). Moving from claim to claim, the court will do just that. The class claims are as follows:

- Counts I, II, III, and IV: Manipulation in violation of CEA, principal-agent liability, aiding and abetting liability

- Count V: Violation of Section 1 of the Sherman Act

- Count VI: Violation of Section 2 of the Sherman Act (against The Andersons only)

- Count VII: Unjust enrichment and restitution/ disgorgement under Illinois law.

Counts I, II, III, and IV allege that defendants manipulated commodity prices in violation of the CEA, 7 U.S.C. §§ 1, et seq., and 17 CFR 180.1(a) and 180.2. CEA manipulation claims require the following elements: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." Kohen I, 244 F.R.D. 469, 475 (N.D. Ill. 2007), aff'd, 571 F.3d 672 (7th Cir. 2009) (citing In re Soybean Futures Litigation, 892 F. Supp

1025 (7th Cir. 1995)); see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig., 801 F.3d 758, 764–65 (7th Cir.2015) (describing the same four elements). All four of these elements are common issues. None require a determination that would vary depending on the individual class member.

In addition to these four elements, plaintiffs seek liability against defendants for the acts of their agents. To find such liability, a finder of fact would have to decide whether the "act, omission, or failure" at issue was undertaken by "any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office." 7 U.S.C. § 2(a)(1)(B). Once again, this determination is a common issue, it will not vary from class member to class member.

The last CEA manipulation related claim is liability against defendants for aiding and abetting. The elements of aiding and abetting liability are that defendants: "(1) had knowledge of the principal's…intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." Damato v. Hermanson, 153 F.3d 464, 473 (7th Cir. 1998). Like the principal-agent liability claim, the aiding and abetting claim poses entirely common issues.

None of the CEA claims require plaintiffs to prove that they suffered actual damages. While there are some out-of-circuit cases that read the CEA to contain this requirement, this court is bound to follow (and persuaded by) the Seventh Circuit's reading of the statute, as explained above in the discussion of Port 22's typicality.

Count V alleges that defendants violated Section One of the Sherman Antitrust Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

22

in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Because, taken literally, this language could outlaw every contract, the Supreme Court has read Section One "to outlaw only unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997). For plaintiffs here to succeed on their Section One claim, they must prove: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." Agnew v. Nat'l Collegiate Athletic Ass'n, 683 F.3d 328, 335 (7th Cir. 2012). The first two elements are common to all class members.

The third element, "an accompanying injury," is more nuanced. To establish an antitrust injury, a plaintiff must show that their "claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 481 (7th Cir. 2020). While this inquiry can sometimes be quite complicated, here it is easy. See id. at 482 (holding that"[t]he general rule is that customers and competitors in the affected market have antitrust standing"). Here, class members are competitors in the market that defendants are alleged to have manipulated. Thus, class members suffered injuries that are of the type that the antitrust laws were intended to prevent. See generally, Brunswick Corp. v. Pueblo Bowl O-Mat, Inc., 429 U.S. 477, 489 (1977) (explaining that antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation").

Once again, the net-gainers issue arises. Defendants argue that since injury is an element of a Section One claim, the presence of net-gainers, who were not injured at all, presents an individualized inquiry that will predominate over common questions. The court disagrees with this position for the same reason as articulated above regarding overbreadth; defendants' position

23

blurs the line between antitrust injury and damages.  The court is persuaded by the First Circuit's position that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset."  In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015).  See also Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262 n.14 (1972) (explaining that"[c]ourts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped").  Defendants' market manipulation is alleged to have cause an antitrust injury to every class member; each held positions that are alleged to have lost value due to a conspiracy to restrain trade.  While some class members, by virtue of other positions they held, ultimately received a windfall that outweighed the harm they suffered, that issue is properly regarded as one of damages, not antitrust injury.[4]

Thus, at the certification stage, plaintiffs can show that the injury element of their Section One claim is a common question if they can show that "it is feasible to prove that the plaintiff class as a whole has been injured by the defendants' conspiracy… even though individual damage questions remain to be resolved at a later stage of the proceedings."  Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 336–37 (N.D. Ill. 1997); see also De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232–33 (7th Cir. 1983).  Plaintiffs have done so.  The contested details of plaintiffs' proof, especially Pirrong's model, will be further discussed below.  But the

---

[4] The Seventh Circuit has adopted a similar logic in the securities fraud context.  Schleicher v. Wendt, 618 F.3d 679, 684 (7th Cir. 2010) (Easterbrook, J.) ("That the class includes short sellers (many investors were long at some times and short at others) also is irrelevant. A person buys stock (goes long) because he thinks the current price too low and expects it to rise; a person sells short (sells today and promises to cover in the market and deliver the shares in the future) because he thinks the price too high and expects it to fall. These positions are mirror images. If a long can participate in a class, so can a short. Both the long and the short are affected by news that influences the price they pay or receive. It may turn out that the shorts do not suffer compensable losses—that, indeed, the shorts' gains should be subtracted from the longs' losses, and only the net treated as damages—but this does not imply that the class definition is defective.").  While this case concerns an antitrust violation and not securities fraud, the underlying dynamic is largely the same: illegal conduct allegedly manipulated the price of a market-traded asset, and the class definition included market participants who stood to gain, lose, or some mix of the two depending on the positions they held at the time the artificial price endured.

bottom line is that because plaintiffs have shown that it is feasible to prove that the plaintiff class as a whole was injured by defendants' conspiracy—because it is feasible to prove that the alleged manipulation caused an artificial market price—the injury element of plaintiffs' Section One claim is a common question.

Count VI alleges monopolization in violation of Section Two of the Sherman Act against the Andersons, Inc. 15 U.S.C. § 2. A claim under Section Two of the Sherman Act requires "two elements: (1) the possession of monopoly power in the relevant market [;] and (2) the willful acquisition or maintenance of that power." United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966). As plaintiffs point out, defendants do not contest that the Section Two claim consists of common elements. The court finds that both elements are common to all class members.

Count VII is an unjust enrichment claim under Illinois common law. Unjust enrichment is a common-law theory of recovery that arises when a defendant retains a benefit to the plaintiff's detriment, and this retention is unjust because of some improper conduct by the defendant. Cleary v. Philip Morris Inc., 656 F.3d 511, 517 (7th Cir. 2011). Typically, this improper conduct is the basis of another claim against the defendant. Id. If an unjust enrichment claim rests on the same improper conduct alleged in another claim, as it does here, then the "unjust enrichment claim will stand or fall with the related claim." Id. Plaintiffs' unjust enrichment claim incorporates by reference all the claims preceding it. Thus, plaintiffs seek an unjust enrichment remedy, such as restitution or disgorgement, if they prevail on any of the preceding claims. Because the unjust enrichment claim is completely derivative of the claims before it, the court need not analyze it further for purposes of determining predominance. Count VII poses no new common or individual issues for resolution at trial.

Having examined in-depth the elements of the causes of action alleged by plaintiffs, the court has found not a single issue—aside from individualized damages determinations that would occur after a finding of liability, if any—that is individual. Even if the court found some of the issues to be individual, that would not necessarily defeat predominance. As plaintiffs rightly point out, the ultimate inquiry before the court is whether common issues predominate in the case as a whole. See Tyson Foods v. Bouaphakeo, 577 U.S. 442, 453-54 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.") (internal citation omitted).

In this case, the court is confident that common issues will predominate over the individualized damages determinations that will have to occur, if at all, after a finding of liability. Courts routinely find that common issues predominate over individualized issues in the context of CEA or antitrust claims, especially when the primary individual issues are damages determinations. See, e.g., De La Fuente, 713 F.2d at 233 (explaining that "[i]t is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members"); Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 336–37 (N.D. Ill. 1997) (explaining that "[t]he weight of authority in antitrust cases indicates that the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class….[t]he fact that particular individuals may have suffered varying degrees of injury does not overcome this general proposition").

26

c. Statute of limitations defenses

Defendants ask the court to find that an individualized affirmative defense—the statute of limitations on CEA claims—defeats a finding of predominance. The court disagrees with defendants. At the outset, the court notes that defendants do not assert an affirmative statute of limitations defense to the claims under the Sherman Act. Defendants allege only that the two-year statute of limitations for CEA claims may have elapsed for some class members before the filing of this case. After extensive discovery, in support of this argument, defendants provide some evidence regarding a single class member. Regarding the rest of the class members, defendants offer the following: (1) a newsletter that includes defendants' justification of their conduct; and (2) a Tweet that has three likes and zero reposts that notes the source of information "doesn't have many followers."

This slender evidence is not enough to disturb the court's finding, after a rigorous examination of the underlying elements of plaintiffs' causes of action, that common issues will predominate over individual issues. See Tyson, 577 U.S. at 453-54 (explaining that certification under Rule 23(b)(3) is appropriate even if there are "some affirmative defenses peculiar to some individual class members"). The court would likely reach the same result even if the evidence supporting the availability of a statute limitations defense was more robust and applicable to a wider group of class members. See, e.g., In re Linerboard Antitrust Litig., 305 F.3d 145, 162 (3d Cir.2002) (explaining that "[c]hallenges based on the statute of limitations…have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability"); Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000) (explaining that "[a]s long as a sufficient constellation of common issues binds class members together, variations in

27

the sources and application of statutes of limitations will not automatically foreclose class

certification under Rule 23(b)(3)"); Saltzman v. Pella Corp., 257 F.R.D. 471, 486 (N.D.Ill.2009)

(holding that "this Court has rejected the per se prohibition against certification based upon

statute of limitations differences [between claims arising under the laws of different states]").


    d. Class-wide proof of price artificiality and harm

Defendants argue, correctly, that the existence of price artificiality is a necessary element

of a CEA claim. See Kohen I, 244 F.R.D. at 475. From this premise, defendants argue that it is

plaintiffs' "burden to show that they have a method of proving artificiality and damages" on a

class-wide basis. Because of the allegedly flawed statistical methods Pirrong employed in his

expert report, defendants argue that it should be given "no weight," and thus plaintiffs have

failed to satisfy their burden.

Before getting to the heart of defendants' argument, the court first must clarify precisely

what plaintiffs' burden is under the predominance analysis of Rule 23(b)(3). Beginning with the

text of the statute, the predominance element of Fed. R. Civ. P. 23(b)(3) is satisfied if "the court

finds that the questions of law or fact common to class members predominate over any questions

affecting only individual members." The court notes that this text does not reference an

evidentiary standard or mandate a finding that certain evidence meets a particular standard of

reliability. Nevertheless, courts have layered more meaning upon this relatively spare text.

Predominance is more than "a pleading requirement." Parko v. Shell Oil Co., 739 F.3d

1083, 1086 (7th Cir. 2014). The Seventh Circuit has made clear that it is not sufficient at the

certification stage for the plaintiffs to show they merely "intend to rely on common evidence and

a single methodology to prove both injury and damages." Id. (Emphasis in original). Instead, "when factual disputes bear on issues vital to certification (that is, to whether the suit should be allowed to be litigated as a class action), such as predominance, the court must 'receive evidence ... and resolve the disputes before deciding whether to certify the case.'" Id. at 1085 (quoting Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 676 (7th Cir.2001)).

The key to applying this standard correctly is to first identify the factual dispute at issue. Defendants mistakenly understand this precedent to command the court to act as a factfinder on the ultimate issue of whether plaintiffs' evidence on price artificiality is correct. But the factual dispute that the court is tasked to resolve at certification is not to resolve the merits question of whether there was indeed price artificiality. See Messner, 669 F.3d at 811. Instead, this court should "take a peek at the merits before certifying a class….[i]f something about 'the merits' also shows that individual questions predominate over common ones." Schleicher v. Wendt, 618 F.3d 679, 685 (7th Cir. 2010). Here, the court is required to look at Pirrong's report to resolve the factual dispute over whether common issues will predominate over individual ones. The court is not tasked with evaluating Pirrong's report to determine whether plaintiffs will ultimately succeed in their proof of a common issue. See id. (explaining that "a certified class can go down in flames on the merits"). The Supreme Court's decision in Comcast v. Behrend, 569 U.S. 27, 35 (2013), adds one additional requirement to this inquiry: "that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." See also Kleen Products LLC, 831 F.3d at 929 (applying Comcast).

Taking into full account the deficiencies in Pirrong's report,[5] the court finds that

---

[5] These are discussed in the court's decision in Dennis v Andersons, Inc., No 20-cv-4090, 2024 WL 5127313 (N.D. Ill. Dec. 17, 2024).

plaintiffs have carried their burden to show that common issues will predominate over individual issues. In addition, the court finds that Pirrong's model satisfies the <u>Comcast</u> inquiry, because his model measures only those damages attributable to plaintiffs' damages theory. To be clear, the court is not simply reiterating its finding that Pirrong's report is admissible. <u>Cf.</u> <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 982 (9th Cir. 2011) (vacating and remanding where "the district court seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible" under <u>Daubert</u> instead of going on to "judg[e] the persuasiveness of the evidence presented"). Rather, when held up against the factual inquiry at issue here—whether common issues will predominate over individual issues—Pirrong's report, by a preponderance of the evidence, shows that common issues predominate. This is true regardless of the court's opinion on how persuasive Pirrong's statistical methods are in showing that price artificiality existed, because that is not the factual question before the court. The issue before the court is whether the existence of price artificiality is a common or individual issue.

A brief review of two relevant precedents illustrates why this case is more straightforward than other cases that require courts to parse technical methods to resolve factual disputes at the class certification stage. In <u>Parko</u>, 739 F.3d at 1086, upon which defendants rely, the Seventh Circuit reversed a district court's class certification because the district court failed to "investigate[] the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments." <u>Parko</u> concerned benzene pollution which was alleged to have emanated from an oil refinery and contaminated the groundwater under class members' homes, resulting in a loss of class members' property values. The defendants contended that the pollution originated from other polluters not named in the suit, and "that in consequence class members could well have experienced different levels of contamination, implying different damages, caused by

30

different polluters." Id. at 1085.

Parko, then, presented the district court with a factual controversy concerning whether common questions predominated over individualized questions. If defendant's factual assertions were correct, then individual issues would predominate over common issues. See id. at 1086-87 ("For if the defendants are right, there is no common issue, only individual issues that will vary from homeowner to homeowner."). In contrast, here defendants have offered no contrary factual assertions that, if correct, would result in individual issues predominating over common issues. Instead, defendants have offered factual assertions that, if correct, show that Pirrong's report fails to prove price artificiality. If defendants are correct, then individual issues do not predominate over common issues. Instead, plaintiffs' common claim simply fails on the merits. Thus, Pirrong's report, though it could fail on the merits, is sufficient for plaintiffs to carry their burden to show that common issues predominate. Ultimately, there is not really a factual dispute for the court to resolve on this issue, because defendants have provided no facts disputing that the existence (or non-existence) of market-wide price artificiality is a common issue.

In Comcast, 569 U.S. at 31, plaintiffs alleged four distinct theories of antitrust impact, but the district court "accepted the overbuilder theory of antitrust impact as capable of classwide proof and rejected the rest." Nevertheless, to establish that damages could be calculated on a class-wide basis, plaintiffs relied solely on a regression model that included the effects of all four theories of antitrust impact rather than the "overbuilder" theory that the district court accepted. Therefore, there was a fundamental flaw in the evidence supporting the proposition that damages could be calculated on a class-wide basis, because there was no evidence showing that it could be done for the overbuilder theory of antitrust impact approved by the court alone. The district court was essentially left to rely on the mere "inten[t] to rely on common evidence and a single

31

methodology to prove both injury and damages," which is not sufficient. <u>Parko</u>, 739 F.3d at 1086. Here, even if Pirrong's statistical method is ultimately found to be unpersuasive on the merits, there is no similar disconnect between the accepted theory of liability—that defendants manipulated the market in the manner described in the complaint—and Pirrong's report, which attempts to estimate the artificiality that resulted from that manipulation and uses that estimation of artificiality to calculate the subsequent harm inflicted upon class members.

In summary, while the court must "receive evidence" to resolve "factual disputes [that] bear on issues vital to certification," defendants simply have not identified the existence of such a factual dispute. <u>Parko</u> 739 F.3d at 1086. Defendants offer no evidence or factual argument in opposition to the position that price artificiality in the SRW market is a common issue that could be proven on a class-wide basis. Instead, defendants ask the court to evaluate Pirrong's report on the merits, which is not appropriate here. <u>See</u> <u>Messner</u>, 669 F.3d at 811. Pirrong's report also satisfies the <u>Comcast</u> requirement because its method to estimate damages measures only those damages attributable to the theory of harm that is common to the proposed class.

## E. Superiority

Because plaintiffs seek to certify their class under Fed. R. Civ. P. 23(b)(3), they must show "that a class action is superior to other available methods of resolving the controversy." Plaintiffs argue that a class action is the superior method because the work and expense of prosecuting these claims individually could exceed the value of individual class members' damages. Although plaintiffs recognize that there may be costs to the individualized hearings that may be required for certain issues, plaintiffs argue that the corresponding efficiencies of judicial economy, uniformity of decision, adjudication in a single forum, and the vindication of

32

rights that may prove too expensive to pursue on an individual basis outweigh the cost.

Defendants argue that plaintiffs have failed the superiority requirement of Rule 23(b)(3) because they have not shown that the proposed class action would be manageable at trial. Defendants argue that plaintiffs failed to include the "customary trial plan that could address how classwide issues could be resolved." In addition, defendants allude to the possibility of hundreds of separate hearings on whether class members suffered actual damages and on the statues of limitations issues.

The court agrees with plaintiffs. First, the court notes that submission of a trial plan is not a prerequisite to class certification. Gillespie v. Equifax Info. Servs., LLC, No. 05-cv-138, 2008 WL 4614327, at *9 (N.D. Ill. Oct. 15, 2008) ("Although some courts may require plaintiffs to submit trial plans as part of their motions for class certification, . . . the Seventh Circuit has imposed no such requirement as a prerequisite to class certification").

Second, and most importantly, the efficiencies of adjudicating this matter as a class action are overwhelming. See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (2014) (explaining that "[t]he Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results"). This matter, which involves a multitude of individuals with common claims that are likely too expensive to litigate individually, is precisely the type that the class action mechanism exists to resolve. See generally Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985) (explaining that class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually").

Even if defendants are correct that damages claims will have to be adjudicated individually—the court has already explained why individual actual damages are not a necessary element of a CEA claim in Part D(2)(b), above—liability can be determined on a class-wide basis.  Thus, it is unsurprising that courts regularly find superiority exists in market manipulation cases that may require individual damages hearings. See e.g., Kohen I, 244 F.R.D. at 481; In re Natural Gas Commodities Litigation, 231 F.R.D. 171, 185 (S.D.N.Y. 2005).  This case is no different.

## CONCLUSION

For the above reasons, plaintiffs' motion for class certification is granted in part. (Doc.147).  The court certifies plaintiffs' proposed class pursuant to Rule 23(a) and Rule 23(b)(3) class to pursue all Commodity Exchange Act, Sherman Act, and unjust enrichment claims against defendants. The certified class is defined as follows:

> All persons or entities who purchased—(a) a long position in Chicago Board of Trade ("CBOT") soft red winter ("SRW") wheat December 2017 or March 2018 futures contracts; (b) a long position in CBOT call options on CBOT soft red winter wheat March 2018 futures contracts; or (c) a short position in CBOT put options on CBOT soft red winter wheat March 2018 futures contracts—and subsequently liquidated the position through an offsetting market transaction at any point during the period of November 30 through December 14, 2017, inclusive (the "Class Period"), except that sales of CBOT March 2018 futures contracts made after December 14, 2017 qualify for inclusion in the Class only to the extent they were made in liquidation of a long position in the CBOT March 2018 contract which was initiated prior to December 14, 2017.  Excluded from the Class are Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

The court appoints Richard Dennis and Port 22 as class representatives.  Lowey Dannenberg, P.C. and Kirby McInerney LLP are appointed as co-class counsel.

34

The parties are directed to file a joint status report, using this court's form, by June 9, 2025.  This status report should also include a draft of the notice to the class and discuss any other issues that the parties wish to raise.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

DATE:   **May 7, 2025**